IN RE NATURALIZATION OF VURA.

1. **Naturalization Proceedings in State Courts Reviewable.**

   State courts by virtue of acts of congress are invested with power to admit aliens to citizenship and to administer naturalization laws; hence, as an incident thereto, the power conferred may be exercised according to the laws of procedure governing the courts of the state, including the right of review, notwithstanding such appellate rights are withheld in the federal courts therein.

2. **Applicant for Naturalization Fraudulently Representing Himself as Lawyer to Defraud Helpless Countrymen, Rejected.**

   Circulation by an alien of a business card falsely representing himself as a lawyer with the evident intent to injure helpless emigrant countrymen, is evidence of lack of good moral character justifying a rejection of his application for naturalization, especially since it appears that applicant sought citizenship to obtain a notorial commission to aid him in schemes to deceive and defraud.

ERROR.

*Bartholomew, Leeper & White,* for plaintiff in error.

*J. B. Waterworth,* for defendant in error.

## GRANT, J.

This is a petition in error, the object and prayer of which is to reverse the judgment of the court of common pleas of this county refusing the application of Stephen Vura for admission to citizenship of the United States, under the laws permitting· the naturalization of aliens.

The assignment of error is that the finding of the court below, that the applicant was not entitled to be admitted as a citizen, and the judgment of that court dismissing his application are contrary to the weight of the evidence.

The government of the United States has intervened in this proceeding, and has been heard at the bar, objecting *in limine* to this court entertaining the petition in error, on the ground

Cuyahoga County.

that it has no jurisdiction to hear the controversy and no power to determine the applicant's contention.

We are first to dispose of this preliminary question. Our immediate jurisdiction, if there is any, is conferred by the organic law of Ohio, under which this court is organized and proceeds.

By that law, constitution of 1912, Art. 4, Sec. 6, the right and duty of this court to review upon petition in error the action of inferior courts extends to all judgments and final orders of the courts of common pleas. This provision, it is believed, comprehends the case brought before us for review by the present record, the court below being one that has common law jurisdiction, a clerk and a seal.

The right to naturalize foreigners in the first instance is reserved to the United States by its constitution, which is the source and foundation of authority in the whole matter. The language of that instrument in this respect, Art. 1, Sec. 8, is:

"The congress shall have power * * * to establish an uniform rule of naturalization, * * * to make all laws which shall be necessary and proper for carrying into execution the foregoing powers." * * *

By adopting the constitution, including this provision, the states have made congress the exclusive depositary of the power to clothe aliens with the rights of citizenship. But it does not follow from this assent that congress must employ only federal courts or other agencies in its exercise of the power thus reserved. It is a constitutional principle, too plain for dispute, that even without express authority from congress the states through their courts or otherwise, may occupy a field of jurisdiction by the federal constitution reserved to the general government, when and so long as the latter does not occupy it. Says Cooley, Principles of the Constitution (3d ed.), p. 35:

"The mere grant of a power to congress does not of itself necessarily imply a prohibition upon the states to exercise the like power. The full sphere of federal powers may, at the discretion of congress, be occupied or not, as the wisdom of that body may determine."

Vura, In re.

And again, page 70, when dealing with the right of congress to regulate interestate commerce, the same learned author says:

"But the mere existence of this power in congress does not necessarily exclude the states from all authority whatever which might affect the commerce falling within the control of congress, provided no actual legislation of congress is interfered with."

And he mentions as allowable action by the state, laws establishing quarantine against noxious diseases from foreign ports, and those requiring locomotive engineers to be examined for color-blindness, even while engaged in interstate commercial traffic. The federal constitution does not, by its own force, completely provide for the exercise of the powers created by it, except in the relatively few cases of which the Supreme Court must take cognizance.

"For other cases," says Cooley, p. 124, "it is necessary that courts shall be created by congress, and their respective jurisdictions defined; and in creating them congress may confer upon each so much of the judicial power of the United States as to its wisdom shall seem proper and suitable, and restrict that which is conferred at discretion. In doing so it may apportion among the several federal courts all the judicial power of the United States, or it may apportion a part only, and in that case what is not apportioned will be left to be exercised by the courts of the states. Thus the states may have a limited jurisdiction within the sphere of the judicial power of the United States, but subject to be further limited or wholly taken away by subsequent federal legislation. Such is the state of the law at this time: many cases within the reach of the judicial power of the United States are left wholly to the state courts, while in many others the state courts are' permitted to exercise a jurisdiction concurrent with that of the federal courts, but with a final review of their judgments on questions of federal law in the United States Supreme Court."

We do not, however, have to rely on this idea—negatively postulated—of the failure of the general government to occupy the entire field of jurisdiction. We may conceive that if by non-user the United States may thereby impliedly allow state

tribunals to act in exercising a power which the constitution has created, not vainly but to be exercised, with better reason it may reach the same end affirmatively by abdicating in favor of the state courts, by surrendering to them, in whole or partly, or by parceling to them, together with its own judiciary, the exercise of the powers created by the constitution of the United States in respect of naturalizations. We submit that as matter of history congress has done both of these things. First, it abdicated to the states. It surrendered to them the entire exercise of the right to admit aliens to citizenship. By the act of 1790, jurisdiction in matters of naturalization was conferred upon state courts exclusively. And, second, it was not till 1802 that the power was extended to federal tribunals, to be shared by them with the state courts. This duality of jurisdiction has continued unimpaired and unquestioned up to this moment. Indeed it is not, *per se,* called in question now. The claim of the district attorney's office, if we understand the argument made at the bar, is this: The right of the state courts to grant or deny naturalization in the first instance is conceded; but it is denied that the right of review at the instance of an aggrieved applicant exists. In other words, while congress has adopted the state courts as its judicial agents in the matter of admitting aliens to citizenship, it refuses to recognize the procedure of those courts, as prescribed in the statutes by which they are created, and which they are bound to follow and obey. The idea seems to be that up to the point of admitting or refusing to admit the foreigner as a citizen the state courts may act, but that when it comes to the question of a review of their action at the suit of an aggrieved applicant the forum must be changed and the matter disposed of according to the course of procedure of the federal tribunals, which it is said do not allow a review of the case.

It is hardly conceivable, we think, that a state court clothed with jurisdiction, with the power to hear and determine, can be compelled by construction only to carve up this power and deny a remedy to which he thinks he is entitled to the man of whose petition it has taken jurisdiction and which the law to which that court owes not only its allegiance but its existence

· Vura, In re.

gives him.  And especially is this difficult to conceive when we consider that he who advances this claim, he who serves this writ of prohibition, gives notice that if the point is yielded and the wronged suitor is turned over to the federal jurisdiction no review will be given him.  If the position taken is tenable, then between 1790 and 1802 there was no right of review in naturalization cases.  For if the jurisdiction of the state courts was cut off at the point of review, and the federal courts had been given no jurisdiction at all in this class of cases, neither the applicant who considered himself wronged, nor the government which might have thought itself saddled with a bad citizen, had any remedy in law.  In our estimation, when congress selects a state court as its agent it takes the court and all its appropriate and necessary machinery along with it, for better or worse. It thus accepts an indivisible situation on the same ground that the common law of England compels a man to take his wife—"for that he hath adopted her and her circumstances together." Another conclusion would be worse than illogical; it would be a denial of justice in many cases and would tend to destroy the necessary unity and entirety of its due and orderly administration.

Beyond this, although far inferior to it in point of importance, the case relied on at the bar in support of the district attorney's opposition to our entertaining this petition in error does not in our opinion support the contention.  It is the case of *United States* v. *Dolla,* 177 Fed. 101.  The first point of departure between it and the case here, and it is a wide one, is that the appeal there was not that of an applicant to whom citizenship had been denied by the inferior court, but an appeal of the government, which was urging a reversal, so that his application might be denied.  The alleged grievance was not that of a perhaps poor and oppressed alien, but that of a powerful but overreached sovereign.  The real point of the appeal is suggested in the bill of exceptions as that of the color line. There seems to have been a suspicion of the old "visible admixture" days; but the bill discloses as an apparently redeeming feature that the applicant had bought a lot in a Savannah graveyard, in which none but whites were allowed to be buried,

### Cuyahoga County.

thus evincing an unwillingness to enter the Jim Crow heaven reserved for those whose color is accidentally black and for those numerous ones of intermediate shades, who did not grow upon trees and whom their white "uncles" were desirous not to have as fellow-citizens here nor as brother saints "over there."

However, the right of review was refused on two grounds by the United States circuit court of appeals. One was that an application for naturalization is not a "case," within the meaning of the federal statutes allowing appeal and error. Instead, it was held to be a "special proceeding," for a review in which case those statutes make no provision. "Special proceedings" in Ohio law are, as we think, the subjects of review in this court by the comprehensive terms of Sec. 12247 G. C., already referred to.

The other point in the case cited was that the allowance of the application for citizenship could be attacked by direct action to annul and cancel the order of allowance. And so the government had a remedy thus given by the act of 1906, and the right of review would be a barren and inappropriate right. This remedy, present in that case, would be wholly wanting in the proceeding at bar; here, the error assigned is that of refusing to admit, and not of admitting, to citizenship. The reason of that case, therefore, fails; and if the case were to be applied as an authority it would defeat and not promote a remedy to which the applicant might in a proper case be entitled.

The brief for the government in the case at bar says: "It is hardly conceivable that congress intended that appeals in naturalization cases should be taken in the state courts while it is not permissible in the federal courts." We shall not stop to haggle over either the grammar of this argument or the meaning of the word "appeal" as we know it, and can not otherwise know it, under Ohio law; in strictness we know that neither in such cases is an appeal allowed in our state courts.

What we *do* say is that in our opinion it is quite inconceivable that a court which is allowed to advance a remedy bottomed on merit should refuse to do so.

We shall refuse the motion of the government to dismiss this

petition without examination of its allegations of error, and shall take jurisdiction of the case.

In so deciding we are not only discharging our duty in administering the laws of our state in their integrity—laws indivisible in their administration, as from their nature and intendment they must be—but we are also clearng our oaths of office in seeing that justice is done and in not denying in a proper case the right of judicial review. We also vindicate the wisdom of the maxim, *judicis boni est judisdiclionem ampliare;* to enlarge his jurisdiction is the part of the good judge. It is not quite true to say that a rejected application may be at once made anew in the same or another court. As the record in the case is transmitted to the government, and by it sent to other courts for reference, the applicant stands before any later court as a blacklisted man and at a great disadvantage.

Coming now to the charge of intervening error in the action of the court below in refusing the application for naturalization, we find the material facts to be these:

The applicant, Vura, circulated and used printed cards of the following form and words:

> Real Estate and Insurance of All Kinds.
>      Cuy. Telephone Princeton 2365R.
>   VURA AND MESZAROS,
>      Law Offices.
> 8115 Holton Ave.        Cleveland, Ohio.

, Neither of the men whose names appear on that card was a lawyer, nor had either ever been admitted to the bar.

In the month of February last Vura handed one of these cards, on which the name of Meszaros had been erased and that of Istvan overwritten in pencil, to the wife of one Szabo, and requested her to tell her husband to call at his office. This Szabo had made an a davit in the federal court in this city, before a United States examiner, in an investigation concerning one Steven Kadi. Szabo called accordingly at Vura's office and the latter told him that he was informed by people in the neighborhood that he, Szabo, had been misinterpreted by the interpreter in the making of the affidavit in question; that

Szabo had probably told the truth in what he said, but that having been interpreted wrongly he was likely to get into trouble about it; and that if he, Szabo, would make a signed statement before him, Vura, he could perhaps relieve him from harm. Vura had such a statement already written out when Szabo called at his office, and the statement was of considerable length. Szabo did not read the statement further than to see that his own name was on it, and left without signing.

Vura explained this transaction by saying that he did what he did out of a desire to be well thought of by the Hungarians who dwelt in his neighborhood by being made to appear instrumental in getting a man out of undeserved trouble. He also claimed that his partner, Meszaros, was an Hungarian lawyer, by which it appears he meant a lawyer in Hungary but not in the United States. Vura produced several witnesses—perhaps five in all—who swore that he was a man of good moral character; but we attach little or no importance to oaths of that kind, taking them as they run.

The judge of the common pleas court held that Vura had not shown himself to have been of good moral character during the whole of his residence in the United States, and in our opinion the record in the case sustains the finding. The card circulated by Vura held him out as an attorney at law, purposely, as we think, with the expectation that this false pretense would deceive others into intrusting to him business which he could not perform. It was a palpable deception, a badge of fraud, and an attempt to injure a class of people who would be helpless against his schemes for an ill-gotten gain. Naturalization would only put into his hands additional weapons for the perpetration of his frauds, such as the advantage of becoming a notary public, which we may suspect was a part of his design in seeking to be made a citizen. The calling of Szabo's wife and of Szabo himself to his office was intended, we can not doubt, to stir up trouble instead of avoiding it. Any act of any person, whether judge or layman, which will render the helpless, because ignorant, stranger within our gates a less easy prey to the wolves in the shape of knowing but conscienceless countrymen, is to be commended by every lawful means at hand. The affirmance

of disabling judgments in cases warranted by the facts and per-
mitted by the rules of law should be included. It is clear to
our minds that the application of Vura was rightly rejected.
A cloud of such witnesses as Vura brought, swearing on a cart-
load of Bibles, could not take off all the contrary conclusions
which even this short record discloses or suggests. To admit
such a man to become a citizen would be to swindle the nation,
which once was treason by law.

Since this is a case of first instance in this court, and as like
cases may come here for review from time to time, we deem it
no impropriety to say, and we say it that it may be depended
upon, that we should hesitate a long time before overruling in
a matter of naturalization a judge who has had the applicant
visibly before him. The right to become a citizen under free
institutions and mild government is a grave and important
thing. The process should be regarded as the applicant's civil
sacrament. Before being granted it is a high privilege to him
to ask for it, and on the part of the government a bounty or
act of grace. When it is granted it assumes proportions of a
much more imposing character. It confers upon the petitioner
advantages beyond valuing or forgetting. On the admitting
government it devolves serious duties of protection and immu-
nity. Until within relatively recent times, naturalization in
Great Britan could be accorded only by letters-patent under
the great seal, or by act of parliament, and even then it con-
ferred only qualified privileges, the right to sit in parliament
not being among them.

In a government where the ballot of the felon goes into the
box with as much potency as that of the saint, that of the de-
served pauper with equal power to that of him who has the
most momentous property stake in a government of law and
order, it is doubly important that those charged with the high
duty of making voters should be vigilant and watchful against
unworthy application. It was the reproach of Carlyle that he
could have little faith in the future of a country where Judas
and Jesus are political equals. It is for admitting courts, among
other agencies, to see that the Scotchman's gibe is underserved
by us.

Cuyahoga County.

The oath which the new-made citizen must take promises that he is "atached to the principles of the constitution of the United States, and well disposed to the good order and happiness of the same." The trial court has many facilities, which a reviewing court can not have, for knowing whether that oath is likely to be kept or not. The demeanor of a loafer, the avowal of the wish for anarchy, a whiskey breath, any of the many but undescribable-on-paper manifestations of general down-at-the heelness and bad citizenship, may be evidences why the vow will not be observed and why the applicant is not "attached to the principles" of our government, and why he is not "well-disposed to the good order and happiness" of our people.

There is no more imperative duty laid upon the courts than that of doing their part in moulding to good citizenship such part of the material—much of it excellent material and much of it quite the reverse—that is being cast upon our shores every day. In this respect the courts can be to the political health of the country what the medical profession at our ports is to its physical health. Rejection of improper naturalization attempts and deportation of undersirable are both in the line of service to the present and future of America.

For this reason, among others, we repeat that as the duty of review in such cases is cast upon this court, a large presumption in favor of the conclusion reached below will be indulged here. The judgment is affirmed.

**Winch** and **Meals, JJ.,** concur.